UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:20-MJ-03278-JJO-1

In Re: Sealed Search Warrant and
Application for a Warrant
_____/

UNITED STATES' RESPONSE TO MOTION OF OPTIMA FAMILY OF COMPANIES,
MORDECHAI KORF, URIEL LABER, AND CHAIM SHOCHET
TO PROHIBIT REVIEW OF SEIZED MATERIALS

Mordechai Korf, Uriel Laber, Chaim Shochet, and various entities they own or control

within the Optima Family of Companies ("Movants") ask that the Court invalidate standard,

considered practice—approved by the Department of Justice and by numerous courts—for the

efficient and careful exclusion of privileged materials from the fruits of a search and seizure

warrant executed at business offices.  Rather than allow disinterested and segregated career

prosecutors to conduct a privilege review with Movants' guidance, Movants say that only they can

be trusted with that task.  The outcome of that approach would cause the investigation to grind to

a halt, and would foist an enormous burden on the Court (or the taxpayers, through the

Government's hiring of a special master).  The Court should deny Movants' request.

The primary basis for Movants' request is their assertion that "the search was the functional

equivalent of a law office search."  Dkt. No. 4 at 2.  That characterization tests the bounds of

credulity.  A single office within a multi-office complex was used by a single in-house lawyer

working for only some Movants.[1]  Three other lawyers had previously served as in-house counsel

over the past decade, but no longer had offices at the search location.  Only three boxes of

_____

[1] Three other offices were rented to lawyers who did not represent Movants.  A single box
of materials was seized from one such office.

materials—of the 85 categories of items seized—came from the in-house lawyer's office. Those three boxes were marked and segregated. Unlike a law firm, whose entire staff is dedicated to legal work, the Optima Family of Companies are ostensibly businesses that conduct business operations. Although some documents seized likely will be privileged, the vast majority will not. The search of a business that happens to have a lawyer on site is a far cry from a law office search, and does not demand the costly delay that Movants' proposed procedure would entail.

Accordingly, the Government respectfully requests that the Court deny the motion, or in the alternative, significantly limit the scope of Movants' proposed alternative review to documents seized from the locations (physical and electronic) used by the in-house lawyer and her assistants, which are potentially privileged. The Government further requests that its own filter team be afforded an opportunity to review all documents seized.

## FACTUAL BACKGROUND

Korf, Laber, and Shochet own, control, or manage a network of more than 30 entities, generally under some variation of the name "Optima," with offices at 200 S. Biscayne Blvd., Ste. 5500, Miami, Florida, 33131.[2] Those entities conduct various activities, including business activities. They own ferroalloy producers and traders, commercial real estate, and other metallurgical interests, among other things. Movants conducted business at the same address for more than a decade, though they changed floors over the years.

---

[2] The full list of the Optima Family of Companies is included in attachment B.3 to the Search Warrant. The Government notes that Movants expressly do not include Optima Specialty Steel, Kentucky Electric Steel, Corey Steel Company, Michigan Seamless Tube, LLC, Georgian Manganese, LLC, Vartisikhe 2005, LLC, Optima Harvard Facility LLC and Optima Stemmons, LLC, so any documents belonging to those entities are not at issue in the instant motion.

On July 31, 2020, this Court issued a warrant to search and seize items from Movants' offices in Miami.  A separate warrant was issued concurrently in the Northern District of Ohio for a search of Movants' offices in Cleveland.[3]

To ensure appropriate treatment of privileged documents seized during the search, the Government included within the warrant application, and this Court ordered, a protocol for the review of privileged materials:

> **Filter for Privileged Materials:** If the government identifies seized communications to/from an attorney, the investigative team will discontinue review until a filter team of government attorneys and agents is established. The filter team will have no previous or future involvement in the investigation of this matter. The filter team will review all seized communications and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege. At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys. The filter team then will provide all communications that do not involve an attorney to the investigative team and the investigative team may resume its review. If the filter team decides that any of the communications to/from attorneys are not actually privileged (e.g., the communication includes a third party or the crime-fraud exception applies), the filter team must obtain a court order before providing these attorney communications to the investigative team.

Attachment to Warrant B.2, ¶ 3.

On August 4, 2020, the Government executed the search warrants.  In Miami, law enforcement agents divided the Optima offices into 28 different locations (*e.g.*, Korf office, Cubicles 1-20).  *See* Exhibit A (inventory of seized items).  That allowed the agents to keep track of the source location of materials, and to identify and segregate potentially privileged materials.

---

[3] Although this Court's jurisdiction does not extend to the review process for the Cleveland warrant, in the interest of proceeding in good faith, the Government has agreed to comply with this Court's order of August 19, 2020 (Dkt. No. 10) with respect to materials seized in Cleveland, and will inform Movants before it does otherwise.

3

On the day of the search, Daniela Rost arrived and informed the agents that she was in-house counsel for "Felman Trading Americas."  Exhibit B, Affidavit of Matthew Hoke, ¶ 3.  She stated that Felman had nothing to do with "Optima."[4]  Exhibit B ¶ 4.  She told agents that Felman Production and Felman Trading were the only two companies that were operational, and that the other companies "don't do anything" and were just holding companies.  Exhibit B ¶ 5.  She confirmed she was the only in-house counsel at the office.  Exhibit B ¶ 6.  Rost identified her office, and the offices of three unrelated attorneys who did not represent Movants or any Optima entity, but simply rented out the space.  Exhibit B ¶ 7.  She noted that stacks of papers belonging to previous in-house counsel, including Robert Powell, were in her office, but that she did not know the contents of those documents and had not reviewed them.  Exhibit B ¶ 8.  Despite having the opportunity to do so, she did not identify any space used by other lawyers for Movants, or any storage space specifically used for legal work or the storage of potentially privileged materials.  Exhibit B ¶ 9.  She did not advise agents regarding specific privileged materials in her office or elsewhere; instead, she made general statements that there were privileged documents.  Exhibit B ¶ 10.  She discussed logistics with agents to ensure that the servers, which held business information related to Felman's operations, would be returned promptly so business operations could continue.  Exhibit B ¶ 12.

As agents searched the Optima offices, they carefully watched for potentially privileged materials.  Whenever agents came across information that appeared might be privileged, they stopped searching and had separately designated filter agents, *i.e.*, not investigative agents, review and segregate those materials.  Only filter agents searched the lawyer offices identified by Rost.  Of the three offices occupied by unrelated lawyers, only one had relevant material, which was

---

[4]  The government disputes this statement's accuracy.

collected in a single box and identified as documents related to Movants.  From Rost's office, only three boxes of materials were seized, items 77 to 79.  Agents segregated those materials, and informed the FBI's document processors that they were to be treated as potentially privileged.  Of the 85 items seized, 28 were marked as possibly containing some potentially privileged materials.

The paper documents seized are being copied, scanned, formatted for electronic keyword search, and Bates-stamped by DocLabs, an FBI facility.  As of August 26, 2020, processing of the first set of documents obtained from the Cleveland search was completed.[5]  Processing of the remaining Cleveland documents, and those from Miami, is in process.  On the evening of August 27, Movants provided addresses to which the Government could send documents.  On August 28, the Government sent Movants discs containing approximately 45,000 pages of materials that had been seized from one of the two Cleveland locations and processed by DocLabs.  Of those, just over 3,000 pages were identified during the search as potentially privileged.  The Government expects to make a production of documents seized from the Miami office early next week containing approximately 4,000 pages of materials, and to continue making rolling productions.

As for electronic files that were seized, the Government is unable to process those materials until passcodes are removed.  Although the Government can accomplish that without assistance, it will add months of processing time.  The Government has requested that Movants instead provide passcodes, which they agreed to do at a meet-and-confer on August 20.  As of August 26, Movants had provided passcodes for the media identified by the Government.  The Government is in the process of examining the electronic media, and expects continuing to work with Movants to unlock and process such media so that it may be expeditiously returned to Movants.

---

[5] Given various logistical considerations, documents from the Cleveland search were put first in the processing queue.

During a meet and confer on August 20, the parties attempted to resolve the issues relating to the review.  The Government provided Exhibit A, an inventory of the items seized.  The parties discussed a modified filter approach, under which categories of documents that were unlikely to contain privileged materials could be reviewed by a filter team, rather than Movants.  Movants proposed a scheme that would allow for such a modified approach on August 24.  On August 25, the Government sent a step-by-step plan for the review, capturing the proposals made by Movants' counsel, and including certain revisions.  On August 27, Movants identified three concerns with the Government's proposal, including, most importantly, the identity of the filter attorney.  On August 27, the Government responded, stating that the choice of the filter attorney should be left to the Government, particularly where the individual is sufficiently isolated in the Government's view.  On August 28, Movants again objected to the Government's proposed filter attorney, and stated that if the Government did not offer suitable alternatives, there was no agreement, and the parties were at an impasse.  The Government proposed an alternative filter agent from the Akron office.

## ARGUMENT

This Court should deny Movants' request for injunctive relief.  A preliminary injunction is an "extraordinary remedy never awarded as of right."  *Winter v. Natural Resources Def. Counsel*, 555 U.S. 7, 24 (2008).  The Eleventh Circuit has described the remedy as "drastic."  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).  The party seeking the injunction bears the burden of establishing four factors:  (1) that it is likely to succeed on the merits; (2) that in the absence of an injunction, it is likely to suffer irreparable harm; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest.  *Winter*, 555 U.S. at 20.

Movants cannot meet that standard—they neither show a likelihood of success nor likelihood of harm.  And the balance of equities and the public interests favor filter reviews.

Moreover, such relief is premature.  As the Government stated at the hearing on August 19, the first step should be, and now has been, discussions between the Government and Movant's counsel.  Following negotiations, the parties came close to agreement on a modified filter-review process that would minimize conflict and streamline the review method.  As of the filing of this response, it is the Government's view that only one issue, the identity of the filter review attorney, needs to be addressed by the Court in order for the parties' compromise to be enacted.

## I.      Movants Do Not Meet The High Standard For A Preliminary Injunction

As an initial matter, Movants suggest that they should be treated differently because "the search was the functional equivalent of a law office search."  Mot. at 2.  And, indeed, the primary authorities they cite in their motion all involve searches of law firms.  *See e.g.*, *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019) (Movants' primary authority); *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955 (3d Cir. 1984); *United States v. Abbell*, 914 F. Supp. 519 (S.D. Fla. 1995); *In re Search Warrant for Law Offices Executed on Mar. 19, 1992*, 153 F.R.D. 55 (S.D.N.Y. 1994); *United States v. Stewart*, No. 02 CR. 395 JGK, 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

That distinction, however, is inapposite.  Even if a heightened set of standards applies to searches of law firms, Movants do not qualify as one.  The vast majority of offices in the suite searched are occupied by businesspeople—the owners, managers, officers, assistants, and employees of the various Optima Family of Companies.  They currently have one attorney, Daniela Rost, who works for them in the Miami office, and to the Government's knowledge, none in the Cleveland office.  By Rost's own admission, she is only the general counsel for two of the

Movants, even though she sometimes provides legal advice to a handful of others.  Over the course of a decade, Movants had three other in-house attorneys, but they do not retain offices in the space searched.  This is no different than any other business office with an in-house attorney.  And it does not approach a "law firm."

Movants also ask to be treated differently because they have been engaged in civil litigation over the years, in which in-house counsel is involved.  Again, that is no different from any other business with an in-house lawyer.  And critically, it is significantly different from the law-office-search cases relied on by Movants.  In those cases, law offices that conducted significant criminal representation work, including for Movants, were searched.  That is not the case here.

At the outset, then, the distinction Movants wish to draw, and their extensive reliance on *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019), is flawed.  They are not a law firm, and have provided no grounds to receive the special treatment sometimes accorded to law firms.

### A.    Movants are unlikely to succeed on the merits of their challenge to a filter team

Movants are unlikely to succeed on the merits of their claim.[6]  To prevail, Movants must show a "strong likelihood of success on the merits."  *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  That means they must show that this Court was wrong to allow a filter review at all.  By implication, it means they must show that filter teams are generally impermissible.  They cannot meet that high bar.

Movants' sweeping statements about the "risks" of allowing a privilege review by a filter team, Mot. at 11-12, are unfounded.  Although they imply that the Government is not to be trusted,

---

[6] The Government notes that Movants begin with the second prong of an injunction analysis, the "harm" factor.  The Government instead proceeds in the order laid out by the majority of cases to apply the four factors.

courts begin with the "expectation and presumption that the Government's privilege team and the trial prosecutors will conduct themselves with integrity." *In re Ingram*, 915 F. Supp. 2d 761, 765 (E.D. La. 2012). *See also United States v. Taylor*, No. CRIM. 10-86-P-H, 2010 WL 2924414, at *1 (D. Me. July 16, 2010); *In re Search of 5444 Westheimer Rd. Suite 1570, Houston, Texas, on May 4, 2006*, No. H-06-238, 2006 WL 1881370, at *3 (S.D. Tex. July 6, 2006); *United States v. Grant*, No. 04 CR 207BSJ, 2004 WL 1171258, at *2 (S.D.N.Y. May 25, 2004).

Movants next assert that allowing a filter team to review documents is an impermissible delegation of powers by the judicial branch to the executive branch. Mot. at 13-14. However, filter teams are a time-tested solution to the complex problem of reviewing voluminous records without investigators uncovering privileged materials or imposing massive costs on the court or the government. Indeed, "[t]raditionally, filter teams have been used to protect privileged information . . . from being viewed by investigators." *United States v. Sealed Search Warrant*, No. 217CR103VEHTMP1, 2017 WL 3396441, at *2 (N.D. Ala. Aug. 8, 2017). *See also United States v. Matter of Search of Info. Associated With Fifteen Email Addresses Stored at Premises Owned*, No. 2:17-CM-3152-WC, 2017 WL 4322826, at *9 (M.D. Ala. Sept. 28, 2017) (noting that practice of employing a filter team "has a lineage of use").

Cases in which a filter team has been used to screen out privileged materials collected in the execution of a search warrant are legion—the process is so widely used, and deemed to protect the interests of the government as well as privilege holders, that there is frequently little comment beyond the use of the procedure. *See, e.g.*, *United States v. Jarman*, 847 F.3d 259, 266 (5th Cir. 2017) ("The taint process here was designed to protect [Defendant's] clients' privileged information."); *United States v. Sutton*, No. CRIMA5:08-CR-40(HL), 2009 WL 481411, at *9 (M.D. Ga. Feb. 25, 2009) (finding that, because of the use of a filter team, a search did not violate

the attorney client privilege); *United States v. Jimenez*, No. CR 16-00153-CG-N, 2017 WL 3568670, at *2 (S.D. Ala. Aug. 17, 2017) (approving of use of a filter team to identify and segregate privileged emails); *United States v. Metter*, 860 F. Supp. 2d 205, 210 (E.D.N.Y. 2012) (noting use of a filter team with similar procedures as those at issue here); *In re Ingram*, 915 F. Supp. 2d at 765 ("the government's proposed filter team protocol shows proper deference to any attorney-client or work product privileges while allowing the government's investigation to proceed"); *United States v. Triumph Capital Grp.*, Inc., 211 F.R.D. 31, 43 (D. Conn. 2002) (approving Filter Team consisting of Government agents and prosecutors); *United States v. Coffman*, 574 F. App'x 541, 565 (6th Cir. 2014) (rejecting the defendant's claim that the government's Filter Team procedure violated due process and finding that the procedure used was constitutional).   When "potentially-privileged documents are already in the government's possession, . . . the use of the taint team to sift the wheat from the chaff constitutes an action respectful of, rather than injurious to, the protection of privilege." *In re Ingram*, 915 F. Supp. 2d at 764–65 (citation omitted).

   Filter teams in no way usurp judicial authority.  They operate under the court's direction, and they are guided by instructions of the court (in this case, via the warrant, and any subsequent orders).  And, both generally and per the Court's particular order in this case, when they make determinations that presumptively privileged materials (*e.g.*, emails sent from a lawyer) are *not* privileged, the filter team must seek permission of the Movants or the Court before allowing investigators to see those materials.  A filter team is no more judicial usurpation than a privilege review conducted by Movants.  Any challenges to Movants' privilege determinations would still be adjudicated by the Court.

The filter process simply allows disinterested employees of the government, rather than highly interested counsel for Movants, to make an initial determination, with access to the documents themselves.  The Court is the final arbiter of privilege, both for disagreements raised by the filter team and challenges raised by Movants.

Movants' next assertion, that a filter review is inappropriate because they were not involved up front in establishing the review process, is a moot point.  There will be no filter team review without further order of the Court, and the parties have had an opportunity to present their positions.  The argument does nothing to establish that filter review generally, or this one specifically, is impermissible.

Movants' third argument—that the filter protocol is inappropriate because it permits agents and prosecutors to review privileged documents—likewise is without merit.  They very briefly argue that such conduct would cause irreparable injury.  Mot. at 15-16.  For the reasons discussed in I.B, below, that argument fails.  There is no "injury" from a filter review; the Government will not use privileged information, and it will not be viewed by anyone investigating Movants.

Quite the contrary, it is *essential* that government filter attorneys be permitted to review potentially privileged documents.  If the Government were, per Movants' request, allowed to review only a privilege log, rather than the associated documents, it would not be able to adequately make arguments about over-designation.  In such a situation, "the Government would not have the opportunity to brief or argue [privilege determinations] aided by the contents of the documents. Without the benefit of such a review, the privilege team would likely be unable to argue, for example, that no attorney-client privilege attached to the communication because of the crime-fraud exception, or that a document should be available for use at trial, regardless of work-product contents, because of necessity and unavailability by other means."  *Grant*, 2004 WL

1171258, at *2.  Even the best privilege log, as this Court noted during the hearing of August 19, 2020, generally will not have adequate information to mount an informed and discriminating privilege challenge.  If government filter attorneys are prevented from reviewing materials, there is a serious risk of non-privileged material being withheld.

Finally, although certain of "in-house counsel's documents and communications were seized," Mot. at 16, that does not render a filter team inappropriate, as Movants claim.  That 3 of the 85 items seized were from in-house counsel's office does not mean that a filter team is improper as to the whole, or even as to the attorney.  Such instances of seizing attorney materials are precisely why a filter team is necessary: it will work with Movants' counsel to run searches to screen out privileged materials.  In every case, potentially privileged materials may be seized.  The fact that some materials are almost certainly privileged is not in itself a reason to eschew a filter review

In short, Movants are unlikely to succeed on the merits of their claim because there is no "delegation" problem with a filter team, because use of filter teams is a well-established and proven practice, because they are not injured, and because the procedures used by a filter team can be tailored to fit the exigencies of the particular search with guidance from the Court and Movants. They have thus not met the standard for a preliminary injunction.

### B.      Movants will not suffer irreparable harm from the use of a filter team

To prevail, Movants must also establish that they are likely to suffer "irreparable harm" from the use of a filter team; the "possibility" of harm is not enough.  *Winter*, 555 U.S. at 22.   A showing of a likelihood of irreparable injury is a "high standard."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  The injury "must be both certain and great; it must be actual and not theoretical."  *Id*.  Movants cannot meet that standard.

Their claim that allowing a government filter review will violate their constitutional rights, Mot. at 8-10, is spurious. The argument goes that, because the attorney-client privilege and work-product doctrine "support" the Sixth Amendment's promise of effective assistance of counsel, and because deprivation of a constitutional right constitutes irreparable injury, allowing a filter review causes irreparable harm.

That argument fails for several reasons. First, the attorney-client privilege is not itself a constitutional right. It is "based in policy, rather than in the Constitution." *Stewart*, 2002 WL 1300059 at *5. In fact, since the privilege "stands in derogation of the public's right to every man's evidence, it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 119 F.3d 210, 214 (2d Cir. 1997) (internal quotations omitted). Privilege "cannot stand in the face of countervailing law or strong public policy." *United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 504 (2d Cir. 1991).

Second, to the extent it "supports" the Sixth Amendment's guarantee of effective assistance of counsel in general, it does not do so here. Notably, there is not yet any Sixth Amendment right at issue. "The Sixth Amendment right to counsel attaches at the first formal proceeding against an accused." *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 203 (2008) (alterations omitted). An individual "cannot establish a violation of [a] constitutional right to the effective assistance of counsel prior to [ ] being charged . . . because [the] Sixth Amendment right to counsel as to that offense had not yet attached." *Philmore v. McNeil*, 575 F.3d 1251, 1257 (11th Cir. 2009).

Additionally, there is not a Sixth Amendment right to assistance of counsel in *civil* litigation—which, according to Movants, are the type of litigation documents potentially at issue here. As the court explained in *Grant*, "there are no Sixth Amendment concerns in this case. The

13

seized documents were not in the files of a criminal defense lawyer, and relate to civil, not criminal, litigation that predates the indictment in this case." *Grant*, 2004 WL 1171258, at *3. Numerous courts have made this distinction. For instance, in *United States v. Rogers,* 751 F.2d 1074, 1077–78 (9th Cir. 1985), the court concluded that the Sixth Amendment right to counsel was not involved where, during the investigation, defendant's former attorney told agents about legal advice he had given to defendant. Similarly, in *United States v. White,* 970 F.2d 328, 333–334 (7th Cir. 1992), the court held that because a defendant's former bankruptcy attorney did not represent defendant "in any criminal matter," the divulgence of potentially privileged attorney-client information did not violate the Sixth Amendment. *See also United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1047–48 (D. Nev. 2006) (collecting cases). Movants identify civil litigation in which they are engaged in detail, but they are not under indictment, and they do not claim that the purportedly privileged materials relate to criminal matters. Their Sixth Amendment argument is therefore inapt.

Third, Movants' argument elides an important point: where the deprivation of a Sixth Amendment right actually occurs. Even assuming that there is a "right" triggered here, the review of privileged documents by disinterested, non-investigative government employees is no different than the review of documents by a special master or the court. There is no "harm" caused by such review. *See Sutton*, 2009 WL 481411, at *9 (holding that because prosecuting attorneys did not view privileged materials, a search did not violate his attorney client privilege). That is because an intrusion into the attorney-client relationship "is not, in and of itself, a violation of the Sixth Amendment." *SDI Future Health, Inc.*, 464 F. Supp. 2d at 1048. A "violation occurs only if the defendant suffers substantial prejudice." *Id.* No prejudice will result from a filter review of Movants' documents. It does not help investigators, as they will never know the contents of those

documents.  A neutral third party committed to secrecy seeing the documents does not cause harm.

Simply put, there is no deprivation of a right at all.  Movants' argument is pure *ipse dixit*:  they

say that they are injured by a filter team without actually explaining how they are injured.

Movants' "second" argument is a regurgitation of the first: "it is clear that review by the

prosecutorial filter team of materials seized from their targets is injurious."  Mot. at 10 (internal

quotation marks omitted).  That is not an explanation of *how* they will *likely be* harmed.  It is a

bald assertion of *generalized* harm.

Movants' allegations of harm are insufficient by any standard, and come nowhere near the

heightened requirements for a temporary injunction.  The claim that "irreparable injury *may* also

occur," Mot. at 10, is a far cry from "likely," and coupled with the complete absence of specifics

about what the harm will be, it cannot prevail.

**C.      The equities are not in Movants' favor**

The equities, likewise, do not favor Movants.  They make a cursory argument that any

delay or other cost associated with rejecting a filter team is outweighed by their supposed

irreparable injury, and the fact that the Government should have known Movants would challenge

the use of a filter team.  That analysis is unpersuasive.

First, this Court already considered various factors when it established the filter protocol

in connection with issuing the search warrant.  The Government did not simply mandate a

procedure; it submitted that procedure for judicial approval.  The Government reasonably expected

that such a procedure was appropriate.

Second, Movants have not adequately articulated the irreparable injury they will suffer.

And, in any event, allowing Movants to conduct a privilege review will necessarily delay the

ongoing investigation.  Even if, as they propose, they produce a privilege log in only 45 days, there

is a high likelihood that disputes will arise, particularly if the designated filter attorney cannot review the actual documents.  There is also an enormous volume of material—over 100 terabytes of data, based on the Government's initial assessment.  If a special master, rather than a filter team, is to review for privilege, it could take months for that process to commence.  It will take even longer for decisions to be rendered.  And a special master will be incredibly expensive.

The *Abbell* case to which Movants pointed during the recent hearing exemplifies the extreme delay and costs associated with a special master.  As the court explained in *Black v. United States* (involving Movants' counsel), the work of the special master in *Abbell* had not been completed more than *two and a half years* after the special master had been appointed.  172 F.R.D. 511, 514 n. 4 (S.D. Fla. 1997) ("In the *Abbell* case, a search was conducted in September, 1994, of the offices of several attorneys, and in excess of 200,000 pages of materials were seized. In September, 1995, the trial judge ordered the documents reviewed by an independent special master to separate the work product privileged documents from those to which the Government had a proper right to inspect. As of the present time (March, 1997) this work has not been completed by the special master and the underlying criminal trial has been delayed for approximately two and one-half years.").   The court in *Black* concluded that "[a] special master procedure utilized in *United States v. Abbell* . . . takes too long and costs too much. It would effectively deprive the Government of any access to any of the seized information."  *Id*. at 516.  This is particularly so here, when the search was not of a law firm, as it was in *Abbell*.

The Government has attempted to proceed in good faith, and reached out to Movants' counsel to request that they "assist with this review" by providing information for search terms to filter documents.  To date, Movants have not done so.

The equities in this case lie in the Government's favor, and against precluding a filter review.

### D.      Filter team review is in the public interest

A filter team promotes the public interest.  Although Movants argue that a filter team's review of potentially privileged documents will suggest "unfairness" that might undermine perceptions of the integrity of the judicial process, Mot. at 16-17, that concern is overstated.

The public in general likely has little knowledge of or expectation regarding privilege review.  Sophisticated entities with involvement in criminal proceedings, on the other hand, are well aware of the obligations that the Government undertakes when handling potentially privileged material, and the sanctions that may be imposed if it disregards those obligations or abuses the court's trust.  There is little threat to perceptions of the integrity of the judicial process in that regard.  Indeed, some might perceive allowing Movants to conduct a privilege review as more likely to undermine the integrity of the criminal justice system.

Even if Movants' identified public interest is implicated, it is certainly not the only interest, and it does not tip the scales.  The public has a "strong interest in the investigation and prosecution of criminal conduct."  *Grant*, 2004 WL 1171258, at *2.  If that interest "is to be adequately protected," "the Government should be allowed to make fully informed arguments as to privilege."  *Id*.  If it does not, individuals would potentially be able to hide important evidence under the guise of privilege.

Relatedly, there is a public interest in minimizing the delay of criminal investigations and the efficient administration of justice.  "Permitting the Government's privilege team to conduct an initial review of the documents will narrow the disputes to be adjudicated and eliminate the time

required to review the rulings of the special master or magistrate judge, thus reducing the possibility of delay in the criminal proceedings." *Id*. at *3.

Additionally, there is a public interest in minimizing costs of criminal investigations both to the government and to the courts. If filter teams are not permitted to conduct a review, the courts would bear a heavy cost of increased litigation and potential review of voluminous records. "[M]agistrates and district court judges would face" a significant "burden" "if they were to routinely review lawfully-seized documents in every criminal case in which a claim of privilege was asserted." *Id.* at *3. *See also United States v. Zolin,* 491 U.S. 554, 571 (1989) ("[W]e cannot ignore the burdens *in camera* review places upon the district courts, which may well be required to evaluate large evidentiary records without open adversarial guidance by the parties.").

Movants do not address any of those critical public interests. And they weigh heavily against disallowing a filter team, and against not allowing a filter team member to review all documents over which Movants may assert privilege. For those reasons as well, the Court should deny the injunction.

## II.    The Government's Proposed Compromise Review Process Would Protect Privilege While Avoiding Excessive Cost And Delay

Despite Movants' lack of entitlement to the injunction they seek, the Government, following discussions with Movants' counsel, and in an attempt to minimize conflict, proposed a modified filter review process. As of the filing of this motion, the parties had come close to an agreement, as follows:

1) The Government will identify, in a spreadsheet, categories of materials based on the locations from which they were seized (e.g., Korf's office, Room A).

2) The Government will process all paper documents seized via the warrant, including the material seized in Cleveland, which will include OCR, bates stamping, and quality control.

3) The Government will turn over copies of all seized paper documents as processing is completed, within 48 hours (excluding weekends/holidays). It anticipates making such

18

productions on a rolling basis, dependent on logical processing breaks as determined by the document processor.

4)  For each such production, the Government will identify whether it believes that the production includes non-privileged documents, potentially privileged material, or both.  If feasible, the Government will identify the file-location of any potentially privileged documents.

5)  Movants, within seven days of receiving a document production, will confirm or contest whether Movants agree with the Government's designations.  If Movants disagree with any portion of the Government's designations, Movants will specifically identify those documents or categories of documents that it disputes.

   a)  If Movants determine that produced documents <u>are</u> potentially privileged, Movants will conduct a privilege review of those documents.  They will have 30 days to do so from the initial date Movants received the documents from the Government.

      i)  For documents that they determine are not privileged, Movants will notify the Government of that determination within 7 days, but no later than the end of the 30-day review period.

      ii)  For documents that they determine are privileged, Movants will prepare a privilege log.

      iii)  During the privilege review, the Government will retain, but will not review, the documents.

      iv)  A Government filter attorney will review the privilege log, as well as, at his or her discretion, the actual documents identified in the privilege log.

      v)  If the filter attorney wishes to challenge a privilege designation, the filter attorney and Movants will try to resolve the challenge, including by redaction, if appropriate, and will submit the challenge to the Court if they are unable to do so.  During that process, only filter team members will review documents identified by Movants on their privilege log.

   b)  If Movants determine that produced documents <u>are not</u> potentially privileged, the Government will nonetheless use the following filter process to review the documents before they are released to the investigative team.

      i)  First, the Government will run an electronic search of agreed-upon terms (e.g. the names of attorneys with whom the Movants may have had privileged communications).

      ii)  If documents do not contain those terms, they will be turned over to investigators for review, and the filter process will be complete.

      iii)  If documents include those terms, a filter attorney will review those documents.  If the attorney determines they are privileged or potentially privileged, the document will not be further reviewed.

19

iv) If the filter attorney determines that documents containing the "filter" terms are either potentially privileged or not privileged, the attorney will inform Movants. Movants will then have seven days to designate the document as privileged or non-privileged.

v) If the filter attorney disagrees with the designation, the filter attorney and Movants will attempt to resolve the disagreement, including by redaction. If there is no agreement, the challenge may be submitted to the Court.

6) If, after documents have been cleared for investigator review by either Movants or the filter process, the Government identifies a document it believes to be privileged, the Government will immediately cease review of the document, will not use that document or information obtained from it, and will provide it to the filter attorney to discuss with Movants.

7) To the extent practicable, the parties will apply the same methodology to the electronic records seized. The parties will meet and confer in good faith to try to reach a resolution if it is not, and will otherwise seek further relief from the Court.

As of the filing of this Response, the parties have not reached final agreement. The primary obstacle is the identity of the filter attorney. Based on Movants' email of August 28, to the extent they do not agree with the Government's selection of a filter attorney, they do not believe that any filter attorney review should be permitted, and none of the compromise proposal outlined above should be implemented.

As a matter of policy and practice, the assignment of attorneys within the Department of Justice is not the decision of defense counsel. As discussed above, the Court begins with the presumption that the Government is to be trusted, and that the Government will follow the protocol to protect privilege and prevent privileged material from being transmitted to investigative team.

In this case, the Government has proposed, in line with department policy, that the filter attorney be an AUSA in the United States Attorney's Office for the Northern District of Ohio's Akron branch office. The investigative team, meanwhile, is located in the Cleveland office. That individual will not be supervised by any member of the investigative team, and will not work on the investigative team on this or related investigations or litigation beyond his filter responsibilities.

Such a choice would ensure sufficient physical and operational distance between the investigative team and the filter team. As a matter of policy, the selection of qualified and available filter attorneys cannot be delegated to the preference of defense counsel; it must reside with the management of the Department of Justice. Unless and until there is a genuine threat that privilege will be invaded by the selection of a particular filter attorney, deference to the Department's choice should be respected.

The parties had also discussed, recognizing the novelty of this approach, that the process and timeline outlined above would be tested in good faith on an interim basis for 30 days. If it is found to be unworkable, the parties will revisit the procedures, and if they are unable to resolve disagreements, may seek further relief from the Court.

To the extent the Court is inclined to implement the above proposal, the Government asks that it be permitted to name a filter AUSA as described above, and that the filter AUSA be permitted to look at all documents designated as privileged without any prior notification of Movants' counsel.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a preliminary injunction is unwarranted and contrary to governing law, and asks that the motion be denied. Nevertheless, the Government asks that the Court mandate the process outlined above, including the terms outlined by the Government.

Respectfully submitted,

DEBORAH CONNOR, CHIEF
  MONEY LAUNDERING AND ASSET
  RECOVERY SECTION

DATED: August 28, 2020     BY:    /s Shai D. Bronshtein
                                      Shai D. Bronshtein, Trial Attorney (#A5502665)
                                      Mary Butler, Chief
                                      Criminal Division
                                      United States Department of Justice
                                      1400 New York Avenue NW
                                      Washington, DC 20005
                                      Telephone: (202) 616-5950
                                      Email: Shai.Bronshtein@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on August 28, 2020, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

                                                      BY:    <u>/s Shai D. Bronshtein</u>
                                                                         Shai D. Bronshtein
                                                                       Trial Attorney, Criminal Division
                                                                        United States Department of Justice